**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
VALDOSTA DIVISION**

| | |
|---|---|
| **DR. LANA FOSTER,** | |
| *Plaintiff,* | |
| v. | **CIVIL ACTION NO. _____** |
| **ECHOLS COUNTY SCHOOL DISTRICT,**<br>**ECHOLS COUNTY BOARD OF EDUCATION,**<br>**SHANNON KING, individually and in her official capacity,**<br>**VINCENT M. HAMM, individually and in his official capacity,**<br>**ROCKY CROSBY, individually and in his official capacity,**<br>**BO CORBETT, individually and in his official capacity,**<br>**PATRICIA GRAY, individually and in her official capacity,**<br>**CHAD PAFFORD, individually and in his official capacity, and**<br>**MITCHELL CHURCH, individually and in his official capacity,** | **JURY TRIAL DEMANDED** |
| *Defendants.* | |

**COMPLAINT FOR BREACH OF SETTLEMENT AGREEMENT**

<hr>

**INTRODUCTION**

This is a complaint for breach of a settlement agreement with Echols County Board of Education and School District ("School District" or "District"), Dr. Lana Foster, and the Equal Employment Opportunity Commission ("EEOC"). Plaintiff Dr. Foster brought race discrimination, retaliation, and Open Records Act claims against the School District in November 2020 and the School District entered into a negotiated settlement agreement with Dr. Foster and the EEOC. *See* Exhibit 1. In addition to paying a financial component of the settlement, a critical

part of the agreement required the School District to develop, implement, and make publicly available a hiring plan to address its racially discriminatory hiring practices. Specifically, the School District was obligated under the contract to "develop a recruitment plan for increasing the number of qualified black applicants for teacher and professional positions." To date, the School District is in breach of this negotiated settlement agreement, having failed to comply with its terms, including without limitation having failed to develop and implement required hiring procedures and a recruitment plan. This is a Complaint for breach of the settlement agreement and for infringement of Dr. Foster's right pursuant to 42 U.S.C. § 1981 to make and enforce contracts as is enjoyed by White, Caucasian members of the community, as those terms have been applied by the Courts. Dr. Foster seeks equitable relief to enforce its provisions as well as compensatory, punitive and all other damages as appropriate and provided by law.

### PARTIES

1.    Plaintiff Dr. Lana Foster is a 62-year-old African American woman and resident of Echols County, Georgia.

2.    Defendants Echols County School District and the Echols County Board of Education are entities created by and existing under the laws of the state of Georgia and may be served with process pursuant to O.C.G.A. § 9-11-4(e) by personal service on its Superintendent.

3.    Defendant Shannon King is the former Superintendent of Echols County School District and signed the Settlement Agreement at issue on behalf of the District. She resides in Echols County and can be served with this Complaint at her residence.

4.    Defendant Vincent M. Hamm is the current Superintendent of the Echols County School District. He resides in Echols County and can be served with this Complaint at his residence or at the School District offices.

5.  Defendant Rocky Crosby is the Chairman of the Echols County Board of Education. He resides in Echols County and can be served with this Complaint at his residence or at the School District offices.

6.  Defendant Bo Corbett is the Vice Chairman of the Echols County Board of Education. He resides in Echols County and can be served with this Complaint at his residence or at the School District offices.

7.  Defendants Patricia Gray, Chad Pafford, and Mitchell Church are all members of the Echols County Board of Education. They reside in Echols County and can be served with this Complaint at their residences or at the School District offices.

## JURISDICTION AND VENUE

8.  Jurisdiction is conferred upon this Court pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (civil rights) because the matters in controversy arise under the Constitution and laws of the United States. This Court has supplemental jurisdiction over the Plaintiffs state law claims pursuant to 28 U.S.C. §1367(a) in that the pendent claims are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

9.  Venue is proper in this Court Venue is proper in this Court under 28 U.S.C. § 1391 because it is a district where Defendants reside or do business and where a substantial part of the events or omissions giving rise to Dr. Foster's claims occurred.

**HISTORICAL SIGNIFICANCE OF ECHOLS COUNTY SCHOOL DISTRICT'S
EFFORTS TO THWART THE GEORGIA OPEN RECORDS ACT IN ORDER TO HIDE
RACIALLY DISCRIMINATORY MISTREATMENT OF DR. FOSTER**

*What is happening is not integration; rather it is disintegration—the near total
disintegration of Black authority in every area of the system of public education.*

*—National Educational Association[1]*

**History of Echols County School District Desegregation**

10.     Echols County School District did not willingly go along with the United States
Supreme Court's Order to desegregate in *Brown v Topeka Board of Education*. "In 1969, the
Department of Justice filed a school desegregation action against the State of Georgia and other
defendants.[2] Later that year a detailed desegregation decree was issued by the court that brought
81 school districts, including the Echols County School District, into the suit. Echols County
School District obtained unitary status from the courts in 2005."[3]

11.     Because of widespread pervasive racial discrimination within Echols County and
throughout the South, the result of enforcing *Brown* has "had an unintended consequence, the
effects of which are still felt today. After the decision, tens of thousands of black teachers and
principals lost their jobs as white superintendents began to integrate schools but balked at putting
black educators in positions of authority over white teachers or students."[4] *See* Exhibit 2.

12.     Disintegration, rather than integration, of Black public educational leadership was
set in motion and Black educators **to date** are ongoingly "purged from public schools in southern
and border states" starting with decades of "White resistance to the *Brown* decision…[this]
expulsion of Black principals and teachers [is] not exclusively a loss to Blacks and the South; it

---

[1] https://www.politico.com/news/magazine/2022/05/17/brown-board-education-downside-00032799
[2] *U.S. v. State of Georgia, et al.*, C.A. No. 12972.
[3] https://www.uscrc.gov/files/pubs/docs/GADESG-FULL.pdf
[4] https://www.edweek.org/policy-politics/65-years-after-brown-v-board-where-are-all-the-black-educators/2019/05

represented the most significant brain drain from the US public education system that the nation has ever seen. It was so pervasive and destabilizing that, even a half-century later, the nation's public schools still have not recovered." LESLIE T. FENWICK, JIM CROW'S PINK SLIP: THE UNTOLD STORY OF BLACK PRINCIPAL AND TEACHER LEADERSHIP, xxiii, Harvard Ed. Press (2022). "Massive White resistance to the *Brown v Topeka Board of Education* decision prompted the firings, demotions, and dismissals of legions of highly credentialed and effective Black principals and teachers. The fight to decimate the ranks of Black educators was so pervasive and severe that its fallout eventually reached the ears of Congress." FENWICK, at 3.

13.    In 1971, the U.S. Senate Select Committee on Equal Education Opportunity held a series of hearings about the displacement and status of Black school principals in desegregated schools as a result of "NAACP's and other civil and human rights organizations' presence, reach and advocacy" at the time in Washington D.C. FENWICK, at 3. The data was well documented in the transcript *Hearings before the Select Committee on Equal Educational Opportunity of the U.S. Senate on the Displacement and Present Status of Black School Principals in Desegregating School Districts* along with the numerous books and scholarly articles written about the tragic firings and demotions that have befallen Black teachers and principals as a result. FENWICK, at xvi. "As testimony at the hearings confirmed, 'resistance to the prospect of Black principals supervising White teachers or of Black teachers for White students remains firmly entrenched in southern White communities. As a result, Black educators are being dismissed, removed, or phased out.'" FENWICK, at 10. In the words of a United States Department of Education commissioner this displacement was "delimiting the ranks of Black teachers and threatening Black principals with extinction." FENWICK, at 11.

14.    "By the late 1970's White resistance – or rather, White racism – had systematically and ruthlessly decimated the ranks of Black principals and teachers…in this annihilation the nation lost at least 100,000 Black principals and teachers." FENWICK, at 129. As Black student enrollment grew, the Black principal and teacher pipeline of exceptionally credentialed Black educators fell dramatically. FENWICK, at 2. In contrast, White educator appointments thrived, even as White student enrollment declined due to White flight. FENWICK, at 2.

15.    Dr. Bettie M. Smith, a Georgia educator explained why the displacement of principals constituted such a painful and unfair loss of talent—explaining that "I speak for all the Black principals in the state of Georgia" where she watched her organization's membership of Black principals dwindle from 190 in 1969 to 6 in 1970. FENWICK, at 11. "The chipping away of the pipeline of Black principals was persistent and pervasive. The fate of Black teachers followed suit." FENWICK, at 14. As the NEA noted in an amicus curiae brief filed in the Senate hearings, "Even where Black teachers are retained at the high school level, they are often reassigned to lower track and vocationally oriented classes. And almost always, they lose positions as department heads." FENWICK, at 14. Cited in that same NEA amicus curiae brief, the pattern of Black educator displacement was widespread across the southern states: "Georgia had 7,687 Black teachers in 1968 and decreased that number by 526. During that same time period, the state had 22,943 White teachers and increased their ranks by 1,086." FENWICK, at 15. Oftentimes, Black educators who resisted illegal firings were subjected to an extraordinary range of reprisals including physical threats of violence; demotion, out of subject placement, and "promotion" (i.e., sidelining) to head district-based federally funded programs like Title I where they could easily be dismissed once the funding ran out. FENWICK, at 16-17. Nearly decades after *Brown* became law of the land, "White school boards, superintendents, and citizens, purposely resisted the new law of the land, often

going to extremes to maintain and perpetuate White control of the nation's public schools." FENWICK, at 122. In fact, when Blacks were removed from principalship and replaced by Whites, Black teachers and students suffered the same fate according to a NEA report "submersion of their interest and identities" and decimation of "every symbol of Black identity." FENWICK, at 124.

16.    Dr. Benjamin E. Mays, the civil rights leader who was a mentor to Dr. Martin Luther King, Jr., president of Morehouse College, and an Atlanta Public Schools Board Member, "characterized the annihilation of Black principals and teachers as traumatic. The trauma that resulted from White racist resistance to Brown was at least fourfold: a decline in the economic and political power of southern Blacks; a reduction in the caliber of public school leadership for the South; a dampening of the professional aspirations of Black educators; and measurable harm to the intellectual and social development and wellbeing of Black youth." FENWICK, at 131.

17.    The fallout of this decimation of Black principals and teachers hits Black students the hardest, as studies have shown that Black students with higher percentages of Black educational leaders are more likely to graduate; more likely to be tested for gifted; less likely to be misplaced in special education; more likely to engage in positive school behaviors; more likely to be described as intellectually capable; are less likely to be suspended or expelled; have higher expectations for academic success; achieve more beneficial outcomes in reading, testing, attendance, and college matriculation FENWICK, at 140.

18.    For students in the Echols County School community and beyond "the loss of Black principals and teachers" is "keenly felt by Black students who often found themselves in unwelcoming and hostile new surroundings. Their intellectual models, guides, protectors, and encouragers…. [t]he ones [like Dr. Foster] who would model and teach them how to negotiate a racist world [are] gone." FENWICK, at 144.

**The Ongoing Decimating Purge of Black Educators
Continues To Date Because Of White Racism**

19.　　And, most insidiously, it continues to date, where in the year 2022 Black educators are terminated, demoted, and denied equal employment opportunities throughout our state of Georgia as a result of continued racial discrimination. Prior to *Brown*, principals and teachers who composed nearly fifty percent of the education workforce were Black, nearly seventy years later to date, no state begins to approach those percentages. FENWICK, at 137. According to the National Center for Education Statistics (NCES) study published in 2020, the nation's schools have "93,200 principals, only 11 percent of them are Black. Of the nation's 3.2 million teachers, only 7 percent are Black. Fewer than 3 percent of the nation's 13,800 school districts are led by Black superintendents." FENWICK, at 138. These low numbers exist even though Black principals and teachers, both then and now, are consistently the nation's most academically credentialed and experienced educators, more likely to hold a doctorate and have more years of professional experience compared to their White peers. FENWICK, at 138.

20.　　Yet the ongoing purge of Black educators continues to inflict irreparable damage in some areas of Georgia, where African American principals and educators, like Dr. Lana Foster, continued to be terminated, demoted, and denied equal employment opportunities as a result of continued racial discrimination. **To date, Echols County School District has failed to hire an African American educator, despite the Settlement Agreement entered into with Dr. Foster and the EEOC.** *See* Exhibit 1.

**FACTS**

21.　　Dr. Lana Foster is a 62-year-old African American woman who worked over thirty years for Echols County Schools. Her parents and daughter have also worked in Echols County Schools and were one of the few African American families ever employed by the Echols County

School Board.

22.     Dr. Foster and her family have suffered decades of racism and discrimination by the same employer she helped to desegregate as a young schoolgirl, the Echols County School District.

23.     Echols County School District's history of racism originated with a deep segregationist history when the United States Department of Justice in an effort to enforce *Brown v. Board of Education*, sued Echols County School District in 1969 for racial discriminatory practices *(U.S. v. State of Georgia, et al.*, C.A. No. 12972).

24.     The United States Department of Justice lawsuit resulted in Consent Decrees and periodical federal investigations, including those related to Dr. Foster's family as recently as a decade ago.

25.     Prior to litigation by the United States Department of Justice, Echols County School District operated under a Jim Crow system. Dr. Foster attended these segregated, all-White schools in Echols County, and then became one of the first Black girls to desegregate the Echols County School District in which she would later teach.

26.     Unfortunately, the historical and systemic racism that has permeated Echols County for over one hundred years has targeted and touched almost everyone in her family, including her husband, father, mother, daughter, and herself.

27.     After Dr. Foster's husband ran for Echols County Board of Education, she and her husband received a death threat, a makeshift grave built for them with a headstone that read, "Here lies the bodies of James and Lana Foster" topped with a watermelon and black face. This makeshift grave was erected in a prominent, public place on display for all of Echols County.



28.    Dr. Foster's father, Mr. Eddie Richardson, died in 2008 after working for Echols County Schools for 43 years. He experienced discrimination, was stripped of his Lead Custodian position, demoted, and replaced by a younger, less qualified, White male in 2006.

29.    Dr. Foster's mother, Mrs. Laverne Richardson worked 34 years for Echols County School District, and experienced discrimination resulting in her firing on August 26, 2007. Mrs. Richardson was escorted off campus and replaced by six younger and lesser qualified White employees.

30.    The Richardson family filed a complaint with the federal government for civil rights violations concerning Mrs. Laverne Richardson's discrimination.

31.     Historically, Dr. Foster has been the only African American teacher placed into a regular teaching classroom until Echols County School District took away her mother's job when Dr. Foster was placed into the Alternative School Director position for the 2008-2009 school year.

32.     In 2008, Mrs. Richardson's granddaughter, and Dr. Foster's daughter, Dr. Jamie Foster Hill, was discriminated against and terminated on account of her race. Despite her stellar performance evaluations, she was replaced as a special education teacher with an unqualified White paraprofessional who did not even hold a college degree.

33.     In 2009, Dr. Lana Foster was further subjected to racial discrimination and retaliation, just as each of her family members experienced the previous three consecutive years. Echols County School District attempted to terminate Dr. Foster who brought a race discrimination and retaliation lawsuit against them in 2011. The School District later settled this case with her, paying her $40,000, but continued to subject her to a hostile work environment.

34.     After the lawsuit was settled in 2011, the discriminatory treatment against Dr. Foster by Echols County Schools along with parents worsened, and Dr. Foster continued to be targeted with vile racism, prejudice, and slanderous false allegations. White colleagues of Dr. Foster were told that their association with Dr. Foster would lead to their termination. White parents isolated Dr. Foster, and Dr. Foster was told that White families in Echols County do not want Black teachers in their children's classrooms.

35.     In 2012, after an investigation by the U.S. Department of Education Office of Civil Rights (OCR), the School District entered into a "Resolution Agreement," resolving OCR's complaint and for the purpose of ensuring compliance with Title VI of the Civil Rights Act of 1964 which prohibits discrimination on the bases of race, national origin, and color. The School District failed to comply with and live up to the "Resolution Agreement." Many of the provisions

of the November 2020 settlement agreement between Dr. Foster and the School District are replicated from the 2012 "Resolution Agreement."

36.    The School District's racial discrimination and retaliation against the Foster family culminated in 2018. After 30 years of loyal service as an educator, Dr. Lana Foster was wrongfully terminated and falsely accused of violating the Professional Standards of Ethics. The Attorney General of the State of Georgia and Professional Standards Commission cleared her name finding no probable cause for these charges.

37.    Dr. Foster sued the School District for ongoing race discrimination, retaliation, and Open Records Act violations.

38.    The Open Records Act lawsuit revealed that two successive Vice Chairs of the Board of Education who participated in the decision to terminate Dr. Foster's employment sent the following text messages on their phones used for Board of Education business, indicating their racial bias:

- "old black women in Tobacco patch . . . talk[ing] about girls feeding their babies animal milk instead of breast feeding" and "that was why the black children acted so bad – with animal Milk they acted like animals."

- "I think I may tell him we want staff dressed in old south theme mammies and butlers."

- "Like I told Frank some folks can screw up a one car n____r funeral."

- Discussing a hiring matter, the employer "[will] prolly want some negro Freddy."

- Discussing a law enforcement officer injured by a criminal, without knowing the culprit, he speculates "Nig?"

39.     The School District entered into a negotiated settlement agreement with the Equal Employment Opportunity Commission (the EEOC) and Dr. Foster under Title VII of the Civil Rights Act of 1964.

40.     The negotiated settlement agreement required the School District not only to pay Dr. Foster $137,500, but also required it, effective immediately upon execution of the negotiated settlement agreement, to develop and implement recruitment and hiring procedures including a written, publicly available hiring procedure, and a recruitment plan for increasing the number of qualified Black applicants for teacher and professional positions. (Exhibit 1.)

41.     In addition to the recruitment plan and hiring procedures, the negotiated settlement agreement also required the School District to provide training to the Superintendent and all managers relating to Title VII of the Civil Rights Act of 1964, and to report completion of the Title VII training to the EEOC, within one year of the effective date of the negotiated settlement agreement. (Exhibit 1.)

42.     Defendants have made no progress in developing a recruitment plan to increase the number of qualified Black teachers, professionals, and managers within the District.

43.     In August 2019, the District's local newspaper, *The Echols County Echo*, featured an article entitled, "School system welcomes new employees", touting a picture of the incoming class of Echols County Schools' new hires. All twelve of the School District's new hires were White. Shown below:



44.     In August 2022, *The Echols County Echo* featured another article entitled "Echols County School System welcomes new employees", touting a picture of the incoming class of Echols County School District's new hires. Once again, all of the District's new hires were White, as shown below:



45.     To date, the School District has failed to hire African American educators and continues to be in breach of the negotiated settlement agreement. This is a complaint for breach of a contractual conciliation/settlement agreement and infringement of the right to make and enforce contracts. Plaintiff seeks equitable relief to enforce the agreement as well as compensatory and punitive damages as appropriate and provided by law.

46.     In November 2020, Dr. Lana Foster and the Echols County School District entered into a negotiated settlement agreement in regard to EEOC Charge No. 415-2019-00041. (Exhibit 1.)

47.     On October 27, 2021, an Open Records Request (ORR) was submitted to the School District seeking responsive documents related to the negotiated settlement agreement between Dr. Lana Foster and the School District.

48.     On November 1, 2021, Williams Oinonen LLC received a response to the Open Records Request from the School District's attorneys at Harbin, Hartley, & Hawkins LLP.

49.     As part of the negotiated settlement agreement (Section III Recruitment and Hiring, Part 1), the School District was required to, "develop and implement a written, publicly available hiring procedure for teachers and professionals". (Exhibit 1.)

50.     When the ORR requested, "the written, publicly available hiring procedure for teachers and professionals from November 3, 2020 to present date", the School District responded with, "This District's hiring procedure is contained in regulation GBC-R(1) located at https://simbli.eboardsolutions.com/Policy/PolicyListing.aspx?S=4061. The exact link for the procedure is:

https://simbli.eboardsolutions.com/Policy/ViewPolicy.aspx?S=4061&revid=Y0MF8IxE6JmEiod aC3W0bg==&ptid=amIgTZiB9plushNjl6WXhfiOQ==&secid=ruE8yj8gaZHBkLjNHWmKZw= =&PG=6&IRP=0.

51.     The negotiated settlement agreement (Section III Recruitment and Hiring, Part 1b-c) requires that the School District's written, publicly available hiring procedure includes, "For each position posted, files should contain a copy of all the candidates' applications and/or resumes including those who are selected for interview and any rubric sheets used and/or any interview notes generated during the hiring committee members" and that, "Written hiring recommendations by the hiring committee will be kept for a period of three years from the date the successful candidate is hired." (Exhibit 1.)

52.     The written, publicly available hiring procedure of the School District is deficient and does not fulfill the their obligation under the settlement agreement because it does not contain any language referring to the retention of, "candidates' applications and/or resumes including those who are selected for interview and any rubric sheets used and/or any interview notes generated during the hiring committee members" or acknowledgement that, "written hiring

recommendations by the hiring committee will be kept for a period of three years from the date the successful candidate is hired". The District has failed to comply with the negotiated settlement agreement Section III Recruitment and Hiring, Part 1b-c, described above (31). (Exhibit 1.)

53.     As part of the negotiated settlement agreement (Section III Recruitment and Hiring, Part 2), the School District was required to, "**develop a recruitment plan for increasing the number of qualified Black applicants for teacher and professional (i.e., guidance counselor, principal, administrator) positions".** (Exhibit 1.)

54.     When the ORR requested, "All documents and communications concerning the recruitment plan for increasing the number of qualified Black applicants for teacher and professional positions (i.e., guidance counselor, principal, administrator) from November 3, 2020 to present date", the School District responded, "The District does not have any records responsive to your requests numbers 2-4, 7, or 11. The above request is number 2 in the ORR. When all documents and communications were sought, none were provided; there are no documents. the School District failed to perform its obligations under the negotiated settlement agreement Section III Recruitment and Hiring, Part 2, described above. (Exhibit 1.) The School District, through its Superintendent and the duly elected members of the Echols County Board of Education, made no attempt to fulfill its contractual duty to develop a recruitment plan for increasing the number of qualified Black applicants.

55.     The negotiated settlement agreement (Section III Recruitment and Hiring, Part 2a) requires that the School District's recruitment plan for increasing the number of qualified Black applicants for teacher and professional positions include, "[i]dentifying sites within a reasonable distance that are the best sources for minority applicants. The School District will also include those sites as the highest priorities for recruitment." (Exhibit 1.)

56.    When the ORR requested, "All documents and communications concerning identifying sites within a reasonable distance that are the best sources for minority applicants." the School District responded, "The District does not have any records responsive to your requests numbers 2-4, 7, or 11/." The School District failed to perform its obligations under the negotiated settlement agreement Section III Recruitment and Hiring, Part 2a, described above. (Exhibit 1.)

57.    The ORR requested, "All documents and communications concerning the highest priorities for recruitment from November 3, 2020 to the present date", but the School District responded that "The District does not have any records responsive to your requests numbers 2-4, 7, or 11." The School District has failed to perform its obligations under the negotiated settlement agreement Section III Recruitment and Hiring, Part 2a, described above. (Exhibit 1.)

58.    The negotiated settlement agreement (Section III Recruitment and Hiring, Part 2d) requires that a recruitment plan developed by the School District for increasing the number of qualified Black applicants for teacher and professional positions include, "Publication of this recruitment plan will be posted on the School District's eBoard website at https://simbli.eboardsolutions.com/lndex.aspx?S==4061, which is linked directly from the front page of the District's website at: http://www.echols..kl2.ga.us/". (Exhibit 1.)

59.    The ORR requested as follows: "All documents and communications concerning publication of this recruitment plan will be posted on the School District's eBoard website at https://simbli.eboardsolutions.com/lndex.aspx?S==4061, which is linked directly from the front page of the School District's website at: http://www.echols..kl2.ga.us/. This should include documentation showing compliance with this recruitment plan posting and the location of where it is at." the School District responded as follows: "The District does not have any records responsive to your requests numbers 2-4, 7, or 11."  The School District has failed to perform its

obligations under the negotiated settlement agreement Section III Recruitment and Hiring, Part 2d, described above. (Exhibit 1.)

60.    As part of the negotiated settlement agreement (Section IV Training), the School District was required to, "provide within one year of the effective date of this Agreement professional training to the Superintendent and all managers (assistant superintendents, principals, assistant principals, and human resource professionals) relating to Title VII of the Civil Rights Act of 1964". (Exhibit 1.)

61.    The ORR requested, "All documents and communications concerning professional training to the Superintendent and all managers (assistant superintendents, principals, assistant principals, and human resource professionals) relating to Title VII of the Civil Rights Act of 1964 from November 3, 2020 onward", and the School District responded that, "Responsive documents are attached."

62.    As part of the ORR, the District was required to provide, "All documents (including photographs, names, and job title positions) showing record of any Black person that has been hired since November 3, 2020 in any capacity within the school district."

63.    The School District responded that, "The District does not have any records responsive to your requests numbers 2-4, 7, or 11." The School District has failed to perform its obligations under the agreement to form a recruitment plan to hire African Americans. To date, no Blacks have been hired since the School District executed the settlement agreement and, indeed, it has failed to hire any Black person in any capacity since it terminated Dr. Lana Foster, one of the very few African American educators that have been hired in over 100 years of the School District's public school existence.

64.     The School District remains in breach of the negotiated settlement agreement to date.

## COUNT ONE

### BREACH OF CONTRACTUAL SETTLEMENT AGREEMENT

*Against Defendants Echols County School District, Echols County Board Of Education, and All Individual Defendants In Their Official Capacity*

65.     Plaintiff fully incorporates paragraphs 1-64, and in particular paragraphs 39-63, of this Complaint, and any paragraph this Court deems relevant, as fully stated herein to support Plaintiff's Count One.

66.     Plaintiff entered into a negotiated settlement agreement with the School District wherein the District was required to comply with the terms of the agreement.

67.     The School District, through its Board of Education and the individual members thereof, failed and continues to fail in performing its obligations under the terms of the negotiated settlement agreement; and thereby breached its contract with Plaintiff and the EEOC.

68.     The School District, through its Board of Education and the individual members thereof, failed and continues to fail to act in good faith to perform its contractual obligations of the negotiated settlement agreement.

69.     Plaintiff is entitled to equitable relief against these Defendants to enforce the terms of the negotiated settlement agreement.

70.     Plaintiff has suffered and will continue to suffer damages proximately caused by the School District's breach of the contractual obligations of the settlement agreement.

71.     Plaintiff is entitled to compensatory relief against and from the School District for all damages flowing from breach of the negotiated settlement agreement in an amount to be determined at trial.

**COUNT TWO**

**DENIAL OF RIGHTS TO MAKE AND ENFORCE SETTLEMENT AGREEMENT
IN VIOLATION OF THE CIVIL RIGHTS ACTS OF 1964 AND 1866
THROUGH 42 U.S.C. § 1983**

*Against Defendants Echols County School District, Echols County Board Of Education, and All
Individual Defendants In Their Individual and Official Capacity*

72.     Plaintiff fully incorporates paragraphs 1-64, and in particular paragraphs 39-63, of

this Complaint, and any paragraph this Court deems relevant, as fully stated herein to support

Plaintiff's Count Two.

73.     Shannon King, former Superintendent of the Echols County School District, who

signed the settlement agreement on behalf of the School District was charged with the

responsibility and final decision-making authority to develop and implement the policies and

procedures of the School District. She ignored her obligation as the Superintendent to comply with

the terms of the settlement agreement because of race and because of her race-based retaliatory

animus toward Plaintiff.

74.     Vincent M. Hamm, as current Superintendent of the Echols County School District

is now charged with final decision-making authority to develop and implement the policies and

procedure of the School District. Superintendent Hamm has knowledge of the School District's

obligations pursuant to the settlement agreement and chose to ignore those obligations because of

race and because of his race-based retaliatory animus toward Plaintiff.

75.     Current board members of the Echols County School District, Rocky Crosby, Bo

Corbett, Patricia Gray, Chad Pafford, and Mitchell Church have decision making authority to

develop and implement the policies and procedures of the School District. The individual members

of the Board of Education, including the individual Defendants named in this Complaint, were

aware of the School District's obligations under the settlement agreement and refuse to carry them

out because of race and because of their race-based retaliatory animus toward Plaintiff.

76.     The actions and inaction of all Defendants in refusing to fulfill the School District's contractual obligations to Dr. Foster have denied her the rights enjoyed by her White, Caucasian counterparts to make and enforce her settlement contract with the School District and to have the full and equal benefit of all laws as is enjoyed by White, Caucasian citizens, as described above and to be further proved at trial, because of her race, Black, African-American, in violation of the Civil Rights Act of 1866, 42 U.S.C. § 1981 (Section 1981).

77.     The actions and inaction of all Defendants in refusing to fulfill the School District's contractual obligations were intentional and committed in reckless disregard for Dr. Foster's rights to be free from discriminatory treatment because of her race, because of her opposition to Defendant's unlawful racial discrimination, and because of her participation in a proceeding under Title VII of the Civil Rights Act of 1964, as described above and to be further proved at trial, in violation of the Civil Rights Acts of 1964 and 1866. 42 U.S.C. § 2000e-3, 42 U.S.C. § 1981. The actions of all Defendants caused Dr. Foster significant financial loss and emotional distress.

78.     All Defendants, acting under color of statute, ordinance, regulation, custom, or usage, have repeatedly refused to fulfill their obligations under the Constitution of the United States, Title VI, Title VII of the Civil Rights Act of 1964 and under state and federal common law – with every such refusal or failure occurring when those obligations required racial integration of the School District, as described above.

79.     In this latest unfortunate chapter of racial intransigence, the School District, the Board of Education and the individual Defendants who carry out the School District's responsibilities, have refused to fulfill the School District's contractual obligations to Dr. Foster because of her race and in retaliation for her opposition to its unlawful policies and practices and

in retaliation for her participation in an EEOC proceeding, causing her to be deprived of rights, privileges, or immunities secured by the laws of the United States under 42, U.S.C. § 1981 (all Defendants) and 42 U.S.C. § 2000e-3 (the School District) .

80.     As a direct, legal, and proximate result of the violations of Dr. Foster's legal rights by all Defendants, Dr. Foster has been damaged in an amount to be proven at trial.

81.     Accordingly, Dr. Foster is entitled the equitable and monetary relief for the violation of her rights under Title 42 as set forth above, which rights under Section 1981 are protected from infringement by the Civil Rights Act of 1871, 42 U.S.C. § 1983.

### COUNT THREE

### VIOLATION OF GOOD FAITH AND FAIR DEALING

*Against Defendants Echols County School District, Echols County Board of Education, and All Individual Defendants In Their Official Capacity*

82.     Plaintiff fully incorporates paragraphs 1-64 of this Complaint, and in particular paragraphs 39-63, and any paragraph this Court deems relevant, as fully stated herein to support Plaintiff's Count Three.

83.     Defendant School District and Plaintiff entered into a negotiated settlement agreement which created all correlating duties, commitments, and obligations arising and flowing from the express language of the settlement agreement.

84.     Georgia law and the negotiated settlement agreement impose upon the School District a duty of good faith and fair dealing in the performance of its respective duties and obligations.

85.     The School District is in breach of the settlement agreement and continues to breach the implied covenant of good faith and fair dealing by its continuing failure to comply with the express terms and implied meaning of the negotiated settlement agreement entered into by the

parties and its failure to act in good faith in executing said contract.

86.     The School District's conduct in breaching the settlement agreement and implied duty of good faith and fair dealing directly and/or proximately caused injury to Plaintiff.

87.     Plaintiff is entitled to equitable relief against the School District to enforce the terms of the negotiated settlement agreement.

88.     Plaintiff is entitled to compensatory and other damages against and from the School District for all damages flowing from breach of its duty of good faith and fair dealing in an amount to be determined at trial.

## ATTORNEYS' FEES

### *Against All Defendants*

89.     The School District's actions in refusing to perform its contractual obligations with Plaintiff evidence such bad faith, vexatiousness, stubborn litigiousness and is carried out with conscious and reckless disregard of the rights of Dr. Foster's rights under the settlement agreement and under law. Defendants' actions have demonstrated bad faith, have no legal justification, and have caused Dr. Foster unnecessary delay and expense. Such conduct on the part of Defendants entitles Dr. Foster to recover her reasonable costs and expenses, including, but not limited to, attorneys' fees incurred in connection with this action under O.C.G.A. § 13-6-11, 42 U.S.C. § 1988, and other applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays the following relief:

1.     That summons issue and be served upon the Defendants in accordance with the law;

2.     That this matter be tried to a jury;

3.     That this Court award equitable relief against any or all Defendants in order to

enforce the terms of the negotiated settlement agreement in ensure future compliance therewith;

4.      That Plaintiff be awarded an amount reflective of all damages, including compensatory damages to compensate the breach of the negotiated settlement agreement and the breach of good faith and fair dealing;

5.      That Plaintiff be awarded prejudgment and post-judgment interest on all amounts for which any or all Defendants are liable;

6.      That Plaintiff have and recover reasonable attorney fees and costs in an amount to be determined by the Court; and

7.      That Plaintiff have and recover such other, further, and different relief this Court deems appropriate under the circumstances.

RESPECTFULLY SUBMITTED, this 11th day of August 2023.

**WILLIAMS OINONEN LLC**

*/s/ JULIE OINONEN*
Julie Oinonen (Ga. Bar No. 722018)
*Counsel for Plaintiff*

3344 Peachtree Rd NE, Suite 800
Atlanta, Georgia 30326-4807
T: (404) 654-0288
F: (404) 592-6225
julie@goodgeorgialawyer.com

**WOOLF LAW FIRM**

*/s/ S. WESLEY WOOLF*
Wesley Woolf (Ga. Bar No. 776175)
*Counsel for Plaintiff*

408 East Bay Street
Savannah, GA 31401
T: (912) 201-3696
F: (912) 236-1884
woolf@woolflawfirm.net

24